Frank R. GOELZ et al., Appellants,

v.

J. K. & SUSIE L. WADLEY RESEARCH INSTITUTE & BLOOD BANK,
Appellee.

No. 15871.

Court of Civil Appeals of Texas.

Dallas.

Sept. 29, 1961.

Rehearing Denied Oct. 27, 1961.

Fred Harless, Henry Smith, and Rosenfield, Berwald & Mittenthal, Dallas, for appellants.

Burford, Ryburn & Ford, Bruce Graham and Clarence A. Guittard, Dallas, for appellee.

DIXON, Chief Justice.

Appellants Frank R. Goelz, individually and as next friend of his minor child Frank R. Goelz, Jr., and C. W. Turner, Guardian of Carol Ann Goelz, brought this suit against appellee J. K. & Susie L. Wadley Research Institute and Blood Bank, hereinafter called Blood Bank, for damages in the amount of $451,000 because of the death of Mary Lou Goelz, wife of Frank R. Goelz and mother of the two minor children.

Appellants allege that following an operation for a spinal fusion, Mary Lou Goelz was administered a blood transfusion; that due to an error on the part of an agent and employee of the Blood Bank blood of a type "A1B" instead of Type "O", her blood type, was administered to Mary Lou Goelz; and that as a proximate result of said error Mary Lou Goelz died.

Appellee Blood Bank defended on the grounds that it is a charitable organization and is therefore immune from liability for the negligence of its servants, agents and employees.

At the conclusion of the testimony the court sustained appellee's motion for instructed verdict and judgment was accordingly entered in favor of appellee that appellants take nothing by their suit.

The material facts are undisputed. The Blood Bank is a charitable corporation or-

ganized in 1951. Its charter recites that it is a non-profit corporation without capital stock with $5,000 on hand at the time of organization, and with the expectation that additional monies and properties will be acquired to further the purposes for which it was formed.

The charter further recites that the corporation was formed for charitable, scientific and educational purposes to achieve which the corporation is authorized (a) to provide a clinic and facilities for patients suffering from diseases or conditions which are the subject of research by the foundation; (b) to promote, provide for and assist in the establishment, support, maintenance and operation of facilities for the manufacture of serums, blood products or other products developed in the conduct of medical research; (c) to provide for the establishment, maintenance and operation of a blood center; (d) to make sales or donations of serums, blood, blood products or other products manufactured or acquired by said corporation; (e) to apply for and secure patents necessary in the corporation's research operations and to sell or assign same; (f) to provide for or assist in establishment, maintenance and support of a teaching program for technicians in the field of medical science; (g) to make awards, grant scholarships and publish papers, etc., connected with research operations; (h) to assist other institutions in the accomplishment of purposes for which the corporation was formed; (i) to solicit, accept and receive by gift, transfer, subscription, donation or bequest money and property, and (j) to acquire and own real and personal property.

The uncontradicted testimony is that the activities of the corporation have expanded until at the time of trial it had about 100 employees. Except for salaries paid to these employees, no one receives any money personally from the operation of the Blood Bank. All funds received by the corporation are used for operation of the Blood Bank, for teaching, and for scientific work.

The Blood Bank supplies blood to persons estimated to number between 20,000 and 30,000 each year. It is also engaged in an extensive research program on problems related to blood transfusions, blood coagulation, and other fields related to blood and diseases thereof. The corporation receives donations of blood and of money. Some of its researches are financed by grants from various agencies and foundations, including the United States Department of Public Health

It is the custom of the Blood Bank to charge $30 per pint for blood furnished unless a relative, friend or some other person donates blood to replace the blood used. In the latter event no charge is made for the blood used. The evidence shows that in several instances the Blood Bank has brought suit against blood users who failed to pay their accounts for blood used.

In the case now before us the personal physician of Mary Lou Goelz left an order for the Blood Bank to type and cross-match her blood and to have 500cc of blood available for surgery the following morning. In compliance with said order an employee of the Blood Bank took a sample of the patient's blood, labeled it with her name and room number and carried it to the Blood Bank center. Mary Lou Goelz's blood was type "O". Unfortunately a technician whose duty it was to type and cross-match the patient's blood, filled in type "A1B" on Mrs. Goelz's card. Accordingly, the latter type of blood was sent to the Hospital and was used in the transfusion. Mary Lou Goelz had an unfavorable reaction from the transfusion. Investigation disclosed that the Blood Bank's employee had failed to use the correct sample of blood, that is, blood from the body of Mary Lou Goelz, when he ran his test and recorded the blood type on Mary Lou Goelz's card. The consequences were fatal.

Opinion

In their first two points on appeal appellants allege that (1) where it is admitted

that appellee was negligent in selling blood which proximately caused the death of Mary Lou Goelz and where it is admitted that one of the appellee's corporate purposes was to sell blood, appellee is not entitled to immunity from liability as a charitable organization; and (2) where the great preponderance of the evidence showed that appellee was engaged in a commercial activity and while so engaged, its negligence, through one of its employees, proximately caused the death of Mary Lou Goelz, appellee is not entitled to immunity as a charitable corporation.

In support of its assertion that appellee was engaged in a commercial activity, appellants rely on the charter provision designated as (d) earlier in this opinion, and on the fact that appellee charges $30 per pint for blood and has been known to sue users for failure to pay their accounts. In support of their contention that these facts render the Blood Bank liable for damages though it may be a charitable organization, appellants rely, among others, on these authorities: City of Houston v. Shilling, 150 Tex. 387, 240 S.W.2d 1010, 26 A.L.R.2d 935; Coefficient Foundation v. Kennedy, Tex.Civ.App., 188 S.W.2d 694; City of Houston v. Scottish Rite Benevolent Ass'n, 111 Tex. 191, 230 S.W. 978; Armendarez v. Hotel Dieu, Tex.Civ.App., 145 S.W. 1030; and Hotel Dieu v. Armendariz, Tex.Civ. App., 167 S.W. 181, affirmed Tex.Com.App., 210 S.W. 518.

We see no merit in appellants' contentions under their first and second points. The cases relied on by appellants are to be distinguished from the present case. For example, Coefficient Foundation v. Kennedy, supra, was a suit for damages for wrongful eviction from a rooming house. Though the defendant's charter showed it was incorporated for charitable purposes the trial court found as a fact that defendant had never functioned according to the purposes set out in its charter. The Fort Worth Court of Civil Appeals said it was "not inclined to give the 'Coefficient Foundation' the benefits vouchsafed to charitable institutions when it has never engaged in charity or benevolences of any kind in so far as the record shows, * * *" [188 S.W.2d 698].

In the Armendariz cases, also relied on by appellants, a servant, agent and employee of a charitable organization operating a laundry was injured while operating dangerous equipment. The sole ground of negligence relied on to sustain the judgment was that defendant failed to instruct the employee in the use of a mangle machine and warn her of the dangers incident to its operation. The charitable organization was held liable, but there is no analogy between the facts and holding in the Armendariz cases and the instant case.

The holding which must control our decision here is that of our Supreme Court in Southern Methodist University v. Clayton, 142 Tex. 179, 176 S.W.2d 749, wherein it is said that sound public policy demands that charitable corporations be held immune from liability for the torts of their agents. See also Penaloza v. Baptist Memorial Hospital, Tex.Civ.App., 304 S.W.2d 203; Baptist Memorial Hospital v. McTighe, Tex. Civ.App., 303 S.W.2d 446; and Jones v. Baylor Hospital, Tex.Civ.App., 284 S.W.2d 929.

■ The fact that a charitable institution charges fees, or sells food or even tickets to sport spectacles, such as football games, does not brand such activities as commercial rather than charitable if, as in this case, the money so derived is devoted to the charitable purpose of the institution. Southern Methodist University v. Clayton, supra; Scott v. Wm. M. Rice Institute, Tex.Civ.App., 178 S.W.2d 156. In the latter case the particular operation, the playing of football, was actually conducted at a profit. See also 11 Restatement of Trusts, Secs. 368, 372.

■ In the instant case the furnishing of blood for transfusion was certainly in keeping with the main purposes for which the Blood Bank was organized. Under the

circumstances of this case the instructed verdict was proper. Enell v. Baptist Hospital, Tex.Civ.App., 45 S.W.2d 395; Baylor University v. Boyd, Tex.Civ.App., 18 S.W.2d 700; Barnes v. Providence Sanitarium, Tex.Civ.App., 229 S.W. 588.

Appellants contend that the rule of immunity should not apply in this case because Mary Lou Goelz was not a patient of the Blood Bank, but was a patient of Baylor Hospital. She was a stranger, so to speak, to the Blood Bank. This contention is rejected in the SMU case heretofore cited.

Appellants' first two points on appeal are overruled.

In their third and fourth points appellants assert that in selling, delivering and furnishing blood pursuant to the order of Mary Lou Goelz's physician, appellee was bound on broad principles of public policy by an implied warranty that such blood was compatible and fit to be transfused into the body of said Mary Lou Goelz.

■ We cannot agree with this contention for these reasons:

(1) The blood actually furnished by the Blood Bank was not shown to have been in any way unwholesome or defective as blood. The death of Mary Lou Goelz was the result of the negligence of the Blood Bank's employee in filling in the wrong blood type number on her card.

■ (2) The common law did not permit actions for damages for wrongful death. The right to bring such an action is allowed only by our death statutes, Arts. 4671–4678, Vernon's Ann.Civ.St., and is limited by said statutes. These statutes and death statutes in other jurisdictions are based on the English Statute known as Lord Campbell's Act passed in 1846. It has been held that under such statutes recovery cannot be had for an implied warranty on the theory of breach of contract. Barley's Adm'x v. Clover Splint Coal Co., 286 Ky. 218, 150 S.W.2d 670; Willey v. Alaska Packers' Ass'n, D. C., 9 F.2d 937; Hasson Grocery Co. v.

Cook, 196 Miss. 452, 17 So.2d 791; Howson v. Foster Beef Co., 87 N.H. 200, 177 A. 656; Burkhardt v. Armour & Co., 115 Conn. 249, 161 A. 385, 90 A.L.R. 1260.

■ (3) In another jurisdiction it 'has been held, and we think correctly, that the supplying of blood for a fee is in its essence the rendition of a service, not a commercial sale of property. Perlmutter v. Beth David Hospital, 308 N.Y. 100, 123 N.E.2d 792. See also Racklin-Fagin Const. Corp. v. Villar, 156 Misc. 220, 281 N.Y.S. 426; Babcock v. Nudelman, 367 Ill. 626, 12 N.E.2d 635; and Gile v. Kennewick Public Hospital District, 48 Wash.2d 774, 296 P.2d 662, 59 A.L. R.2d 761. So there could be no breach of warranty in such a case.

(4) It is true that a breach of contract may also constitute a tort, in which case a cause of action may ordinarily arise under our death statute on the grounds of tort, not breach of contract as such. Eubanks v. Schwalbe, Tex.Civ.App., 55 S.W.2d 906, modified on other grounds, United States Fidelity & Guaranty Co. v. Eubanks, 126 Tex. 405, 87 S.W.2d 248. See also Thaggard v. Vafes, 218 Ala. 609, 119 So. 647; Greco v. S. S. Kresge Co., 277 N.Y. 26, 12 N.E.2d 557. However, it does not avail appellants to brand the alleged breach of contract as a tort in this case for as pointed out in our discussion of appellants' first two points, appellee's immunity as a charitable institution then applies. Appellants' third and fourth points are overruled.

To summarize: the undisputed evidence in this case shows that the death of Mary Lou Goelz was caused by the negligent act of an employee of the Blood Bank. However, so far as the Blood Bank, a charitable institution, is concerned, the particular activity in which the Blood Bank was then engaged—the furnishing of blood for transfusion—was pursuant to the charitable purposes for which it was formed. Therefore, the Blood Bank is immune from liability for its employee's negligence.

The judgment of the trial court is affirmed.